v. Alcatel-Lucent. I know our clerk has conveyed to you the panel's wishes, which is to just have you all up here once. It must be repetitive, so we'll give you 20 minutes. You can divide it up however you wish, and you can address in those portions whichever case you want. You're not going to be held like in a cross-appeal sort of sense to only addressing something in particular. So hopefully that will be enough to fully flesh out all of this. Okay, Ms. Powders. Thank you, Your Honor. May it please the Court. This case involves a very narrow agreement designed to solve a very narrow problem. Under Ericsson's interpretation, this narrow agreement designed to solve a very narrow problem relating to a conflict of a single law firm now is turned into an agreement that provides for an essentially royalty-free license for an entire portfolio consisting of thousands of patents. That is the position they're taking here. It is the position that Ericsson is taking in district courts, including the new action they filed in Florida as well. The narrow agreement designed to solve a narrow problem simply doesn't support that reasoning or that result. With the Court's permission, I'll start with the Florida case. In the Florida case, the Court held that an MFL provision in the PCRA, the Patent Conflict Resolution Agreement, was triggered by the filing of action involving different patents than those involved in the Florida case. That Texas action involving those different patents did not trigger the MFL obligation for several reasons. The first reason is that the PCRA, the agreement under which the MFL right would arise, provides that that MFL right arises only if the patents that are used as the trigger are not, quote, otherwise addressed in the agreement itself. And the patents that were at issue in the Texas case were addressed in the agreement in Article IV. You say they were addressed in the agreement through the damages provision? Yes, Your Honor. So how do you interpret the damages provision? Is it your view that they were addressed because they are standard essential patents? Not because they're standard essential patents, but because the language of the agreement provides that if there's a lawsuit based on them, which there was in Texas based on those four patents, the damages do not accrue until the time the lawsuit is filed, which is obviously contrary to normal operation of law. How do you respond to Eric's focus on the where liability results from making, having made, importing, using, selling? There was no liability as it relates to these patents because they were found to be non-infringing. Well, liability is not a term, I believe, that is defined in the agreement first. And second, liability is a term that doesn't require an adjudication of infringement. So for example, a company does often accrue or take a reserve off of potential liabilities where based on a lawsuit that has been filed or a claim that has been made. So a company may take a reserve of several hundred million dollars in many instances based on that potential liability. Liability isn't required by the agreement as a condition for the damages provision to kick in. That's only when it actually takes effect. But it doesn't say where liability results or potentially kick in itself. True. Article 4, in our view, the key language of Article 4 is that the damages do not accrue independent of whether there's a finding of liability or not, a formal finding of liability in the court. That occurs. Erickson has that right. It knows it has that right without there being a finding of liability. That is something they can, that is a right that they have by virtue of this agreement, not by the virtue of anything else. And that is a valuable right even if there is not a formal finding of liability. They know they don't have to accrue damages. They can take that into account in their planning. And that is the language of Article 4, Section 1. The liability language is where liability results from making, having made, etc. That's merely telling you where, what acts of infringement or what acts by Do you have any argument outside of Article 4 for contending that these patents were not subject to the most favored licensing provisions? Yes, Your Honor, there are two. One is that the most favored nation clause, and this is where the parties have a debate on temporability. The most favored nation clause, in our view, clearly applies to patents that only existed at the time the PCRA was entered into. And that's made clear in Article 7, where it says, where it uses the language, in the event that YLAN owns or controls, present tense, the licensing of patents not already addressed. To be clear, your argument isn't this only applies to patents that control them. Correct, exactly right. More precisely, that's exactly right. And that's consistent with the structure of the agreement. Now, the debate we have is a grammatical debate on the meaning of the words, in the event. And Erickson's argument, as I understand it, is that in the event makes this something that anything can happen at any time in the future. And our view is that in the event means that in the event it becomes known later that YLAN then owned patents that were the subject of, that would be infringed by this UMTS technology, then those would be covered by the MFL. And that is made quite clear by the extrinsic evidence, Mr. Parolin's declaration, which says that the, which is consistent with the structure of the agreement. The structure of the agreement is the covenant applies squarely to patents then owned. That's Article 3. Article 4 then is squarely patents other than those four YLAN patents. I'm interested in that Parolin declaration. That's in there. Is there any other extrinsic evidence that was before the district court that's not in the appendix here? No, I don't believe so. The, there is extrinsic evidence supplied by Erickson, but not really of the same quality as he was personally involved in the negotiations, whereas most of the people who submitted declarations on the Erickson side were not. And his declaration makes quite clear, I think, how this language evolved and how it came about. Yeah, it's an interesting course. I'm going to ask your opposing counsel about their discussion of it, but it appeared to me from the reading that there might be other extrinsic information. Is there not? There's not in the record, but I'm aware of it. Let me ask you, going back to your Article 4 argument and the one that I've heard the Texas court relied upon, how does that, how does your interpretation not cover every single conceivable patent, even those that you are now saying would be covered by Article 7? Understood. There are two real-world situations where Article 4 would not, as Erickson argues, essentially render meaningless Article 7, which is, I understand, the question you're asking. The first is a situation where Erickson currently makes no product that would be subject to the patent. Let's say Weiland is suing someone else or making an allegation against someone else about certain patents, where Erickson has no accrual of liabilities or damages because it's not making a product that would be subject to that patent. Article 7, the Most Favored Nations Clause, gives Erickson the right to ask for a license for those patents so that it may make a product in the future. So that's a situation which is not covered by Article 4, but an independent right given by the agreement under Article 7 to Erickson. That's the first situation. Does it have to be an allegation of infringement against a third party? The agreement says, as to Article 7, that either infringed or alleged will be infringed, but not alleged against Erickson. So the most common situation would be a lawsuit by Weiland against a third party where Erickson sees that and says, I would like a license to that patent so that I can enter this field. And that's an independent and very valuable right. The second situation in which our interpretation of Article 4 does not render Article 7, the Most Favored Nations Clause, meaningless, is the difference between the language about which patents are covered. Article 4, the Damages Clause, is only patents that we own or control. Article 7, the Most Favored Nations Clause, covers patents that we own or control or we own or control the licensing of those patents. So, for example, if we have a license to a patent which we do not own or control, but we have the right to sub-license, which is a common situation, that is a situation in which Erickson would have the right under the MFL Clause to seek a license from us, which would not be covered by the Damages Clause, Article 4, because it's not a patent that we own or control. Okay, you don't really rely on the Article 4 argument very much in your briefs, and yet that's where you start today. Is that what you think is your strongest argument? I think it, as to the MFL Clause, I think that is a very compelling argument adopted by the judge in Texas. I think also the language of the MFL Clause that covers only patents that were existing at the time is squarely, clearly the intent of the parties at the time. The Parolin Declaration makes that very, very clear, and the structure of the agreement makes that clear. I mean, the whole point of this was, as I say, a very narrow agreement to solve a narrow problem. A poorly written agreement to solve a potentially narrow problem. I think it's an astonishingly poorly written agreement on both sides. I mean, it's not consistent with either side's interpretation, I think, is a fair way to look at it. If that's the case, then why aren't we throwing out everything that was decided by both courts below because you've just admitted that the agreement is ambiguous, because it's inconsistent with what either party could have argued, and both of these courts, wrongly then, in light of your statement, found the agreement clear in various ways. If it is inconsistent with what either party argues, it seems the only proper legal way to do this is to send it back to help both courts to accept parole evidence and figure out where it takes them. I agree that's one proper means. The other proper means is that parole evidence is in the record, that parole evidence is available to your honors. It is clear and, in my view, unambiguous. There is not something on the other side from Erickson that contradicts the Parolin Declaration. That declaration is clear from personal knowledge and square on the issues, and that declaration establishes exactly the point that your honor is raising, which is, if you decide that it is ambiguous at the end, and I agree it's horribly written, I think individual clauses, when they're plucked out of context, I think those are ambiguous. I think it is possible to determine the meaning of this within the four corners by taking the agreement as a whole, and that is the position we've taken, and I believe that to be true. I concede, of course, that it's a poorly written agreement, one which you could find to be ambiguous. I don't deny that at all. But, if that path is taken, the parole evidence is here, it is undisputed, and I believe it would be proper for the court not to send it back to consider additional parole evidence because the parties had the opportunity to do that. Well, the Texas court did consider additional parole evidence. The Texas court struck the parole evidence. It granted Erickson's motion to strike it. The Florida court... If it struck it, is it really before us? Are we allowed... If he struck it, are we really allowed because is it therefore part of the record? I'm very technical now. I believe it's part of the record before you. His order striking it is part of the record, but the evidence is in the record, it's in the appendix. You didn't appeal the strike. We did not appeal the strike. I don't know that we can... You're correct, we didn't appeal the strike. What did the Florida court do with respect to the parole evidence? It appeared to ignore it. It did not explicitly address it. It appeared... It's a very truncated terse... But it did strike... The evidence is in there, and it's in the record on appeal, and it was before him and not struck. And so certainly in that... Was all the same parole evidence in both? Because I remember the... Isn't it right that the Florida case, that the only thing really is the MFL clause and the covenant not to sue wasn't relevant? So is all of the same parole evidence that was admitted in Texas still in front of the Florida court? It's not the same. There's a parallel declaration in both. So there's a parallel declaration... The parallel declaration in the Texas case is at 1145 of the appendix. The parallel declaration in the Florida case is at 279. The difference is that the Texas one addressed the covenant not to sue as well. It did, and the Florida case, the Florida declaration, I think, is a little more detailed with regard to the MFL, but the effect is the same. And so with regard to... To answer your honor's question, I do believe that evidence is before you, before you say with regard to the Florida declaration that's here. That declaration, that evidence, is underbudgeted. So the argument outside of... If we were not to look at the declaration, even though it's in the record in Florida, and we're trying to ascertain, as Second Circuit requires us to do, the intent of the parties from the contract as a whole, what is your argument that the Article 7 does not address later acquired patents based primarily on the fact that Article 4 contains language about honor after the effective date, where Article 7 does not? Putting aside the extrinsic evidence, there are two places in which the patent, the agreement, the BCRA talks about honor after acquired. One is Article 4, which explicitly does that, and the other is Article 7 at the end, which is the no admission of liability provision. Can you tell me now why I shouldn't construe Article 3 as being a product license as opposed to a patent license? Because the language of it, certainly in the abstract, if it were the only section of the only document, I would find it incredibly difficult to reach it, and I'm sure you would too, to conclude it wasn't a product license. I understand, Your Honor. I think if you took only the first half of Section 1 of Article 3, which is the portion, of course, that Erickson relies upon, but New York law, which governs this agreement, makes clear you may not do that. So that reading is inconsistent with the second half of the same section. What in particular is it that you think is inconsistent? The portion about the otherwise reserved. So if you look at the structure of Article 3, Section 1, the very first portion is the portion that Erickson relies upon. The next portion talks about what rights. What sentence? Point me to a sentence that you want me to look at. Beginning in the middle that says notwithstanding, maybe 10 lines down. The word notwithstanding is the second word in the sentence, after patents, all caps. That's the section that has a reservation of rights to Wiley, and it is making clear. Exactly which language? Read me the language that you believe reserves that. It's notwithstanding through the end of that sentence. I can read the entirety into the record if you'd like. Notwithstanding the foregoing or the theory of patent exhaustion, the parties here to agree that LME products are not licensed under this Section 1 of Article 3, and that Wiley reserves and retains all rights to sue or assert against LME suppliers or its affiliate suppliers. And then there's a parenthetical that I think isn't relevant. That LME products infringe any Wiley patents. Now the Wiley patents, of course, is a defined term meaning only the four. Right. So the question we're addressing here is whether Article 3 covenant applies to only those four patents or any patents. I interpret this sentence as reserving the right to separately sue suppliers or affiliate suppliers. True. I read this. The preceding section makes it clear to me that Wiley Land has granted a product license to the person with whom it signed the license, but it wants to make clear to that person that I'm not giving, because that's why it says patent exhaustion. Why else would it point to that? Right? I mean the sentence itself screams, you know, you have a license, but that license doesn't extend to other people to whom you may have acquired the product from. I agree in part, but I believe that the focus on the Wiley Land patents, meaning the part that I agree with you, the distinction between the suppliers and Erickson is there. My point is that the dispute here is whether the Article 3 covenant is limited to the four Wiley Land patents, the identified in Attachment A, four Wiley Land patents, or covers any patent which could be asserted against those products, or even under Erickson's theory, it covers any claim that could be asserted against those products, a warranty claim, a product liability claim, any claim at all. I understand why it would be absurd for one to enter into such agreements, but nonetheless, here we are. So keep going. Nonetheless, here we are. Section 2. I'm not persuaded by that sentence at all. So what's your next one? I understand that. Article 4 I think is blindingly clear, because it says the title of it is patents other than the Wiley Land patents. So Article 3. Why isn't this how you could read 3 and 4 together? 3 pertains to LME products as a whole, right? LME products. It never says the UMTS-HSPA products. It's LME products. Which would infringe those four patents. Right. And those four patents are UMTS-HSPA patents. No. Those four patents pertain to, as I understand it, only one section. Right. They're actually HSPA patents. Right. Exactly. Yes. Okay. Which is a subset of UMTS. So the four patents, just to be clear, while people may allege that anyone who practices the standard infringes my patent, that's not always so. Right. Exactly. So the Section 3 is written to LME products. Section 4 is written to UMTS-HSPA products. Why isn't that an important difference that would allow for those sections to coexist in their actually written form? Because Section 3 isn't LME products as a whole. It's LME products, which would infringe any of those four patents. Yes. And those four patents are HSPA patents. So they only infringe those patents if they're HSPA products. It's not any product that's out there in the world. So the scope of the products defined in Section 3 and the scope of the products defined in Section 4 are the same? Yes. It works as LME products. But the patents govern them. Correct. But they're not all products. But they're not the same because, according to you, HSPA products could be products that aren't owned by. Exactly. So LME products have to be products that are owned by them. But according to your interpretation, Section 4, these could apply to products not owned by them, but they want to jump in the market with at some point. Any patents owned by them? No, products. I'm focusing on a distinction between the products. Did you not argue to us that one way, in response to Judge Malley's questions, to reconcile Section 4 and Section 7 is to identify the fact that this one pertains to products which could be owned by some third party that they have an interest in them getting into bed with. That's 7. That's 7. So you're not saying 4. No, no. The point was that 7, the MFL right of 7, could be triggered by Wiley's assertion of a newly acquired, a different patent against a completely third party. Because they control the licensing. Because they control the licensing or even, in that case, own it. An LME, it might not even be an LME product at that point. Erickson might not be in the market at all. It just sees that patent being asserted against a product which it would like to make, and it says, I would like a license. Article 7 confers that value of a right upon them in a way that Article 4 wouldn't apply at all. To continue to answer Your Honor's questions about Article 4, which is where I was going about the differences on the covenant, Article 4, the structure of it is clear, and the language within it, I think, is even more clear. Article 3, the covenant, is the Wiley patents. Article 4 now says patents other than the Wiley patents. And then to put a fine point on it, the first sentence of Article 4 says, with respect to patents other than the Wiley patents, meaning just the four. To which Article 3 applies. Let me try one more time. Why wouldn't 3 and 5 be reconcilable in the following way? Do you mean 3 and 4? Yeah. Thanks. 3 and 4. 3 pertains to LME products which infringe only these four patents, right? Which are HSPA patents, right? HSPA patents. 4 pertains to UMTS-HSPA products, and therefore covers anything that would fall into Series 21 to 35, whereas HSPA is only Series 25. That's true, but it doesn't affect the question of the scope of the covenant. The issue that we were discussing was the question of whether the covenant is limited to those four patents. And my point is that the covenant should be limited to those four patents because that's the structure and language of the agreement. The fact that Article 4 gives a broader right to a broader set of patents, which it clearly does. It even covers after-acquired patents, which Article 3 does not. No, but why wouldn't we read, then, Article 3 giving a free pass to the LME HSPA products in their entirety? It's a product license. Then we come along and read Article 4 as applying to products other than those ones that would have infringed those four patents and therefore fallen under Article 3, and it creates a limited damages provision as to those other products. It does do that, but it also explicitly references Article 3 and makes clear that Article 3 only applies to the four patents. That's the portion I was just reading, which says, the very first sentence of Article 4 says, with respect to patents other than the four YLAN patents, parens to which Article 3 of this agreement applies. So it's saying Article 3 is limited to the four. Now, as to other YLAN patents, including, potentially, after-acquired patents, we're going to give you an additional right, an additional benefit, which is this limitation on damages. So there's no doubt that there's differences between 3 and 4, but that difference is not driven by the fact that 3 gives a portfolio-wide right. The difference is 4. No, no, it's not that 3 gives a portfolio-wide right. It's 3 gives a product license, and 4 says, if you've got something that infringes a patent other than the four patents. It says that. Yes, it says that, which would be, right, anything not in Series 25, anything in 21 through 35 not in Series 25. Including Series 25, specifically including Series 25. Specifically, you mean because it says HSPA? Which is part of the definition. Yes, but isn't... It's a defined term. Right. And the defined term includes both. But the contract doesn't say all HSPA products infringe these four patents, right? So this goes back to the thing that we both agreed on, which is somebody alleges all HSPA products infringe the four patents, but that doesn't make itself. Doesn't always make itself. So given that, why doesn't that give precise light to both terms as exactly written so I don't have to change their words to find meaning in the overall document? I don't think... The fact that it's not always true doesn't mean that it isn't sometimes true. So in this case, I don't think you have evidence to make an assumption or a conclusion as to whether these four patents would or would not cover all HSPA. What we do know is that HSPA in the NPS is a defined term. It's covered by both Article 3 and Article 4. So the same HSPA products would be covered by both. We know that. We know that what's different... But wait, why is it that those acronyms don't appear in Article 3? So how can you say that that acronym isn't there? Article 3 speaks about LME products generally. It never says HSPA products. It does in connection with the infringe any wire and patents. What does that have to do with the price of tea in China? Nothing, but it does have to do with the allegation that that's what this whole agreement was about, that those four patents were asserted against HSPA. That's what the basis for it was. Both sides acknowledged that. That's why the agreement was being entered into, is that both sides acknowledged that those patents were with HSPA. Erickson wanted to write to HSPA. They wanted to write to those four patents. The structure of the agreement was that they got a covenant as to those four and only those four. And there was, as the Perelman Declaration makes clear, they wanted a license to cover everything as to those products, which would accomplish the same effect that they're on. We are so far beyond your 20 minutes. Let's give you a chance. Can I just ask one process question? When the debate over Article 3 began first in the Texas courts, was there any request, because obviously both sides were arguing what it meant, was there any request for reformation of the article to make it clear that it either only applied to those three patents or a request from the other side to make it clear that it didn't only apply to those four patents? I was not involved in the case until after the briefing was completed in this court, so I can't make a representation about it. I believe not. I believe what happened is that both sides just moved for summary judgment on the question. Okay. I believe that's all that happened. It seemed like a logical alternate argument. Okay. All right. Thank you, Mr. Powers. Mr. Krumholz? Good morning. Picking up on the issues that you were just addressing with Mr. Powers, Mr. Krumholz, before you do, I want to ask you a question. Okay. YLAN submitted evidence, and I indicated I was interested in it, in that declaration, A28081 and so on. And in it, it says that the MFL provision was intended to address Erickson's concern that something remains in YLAN's portfolio, which it may later assert, and which Erickson won't be able to use in the course meant to defend against. You don't discuss at all, as far as I can tell in your brief, the actual course of negotiation. Is there any extrinsic evidence to support Erickson's theory that MFL provision applied to future acquired patents? Extrinsic evidence. There is ample extrinsic evidence in the abstract, from the standpoint that were we to contest on the extrinsic evidence, we would have ample evidence to show that... No, is it in the record? I mean, they put it in the record. All the parole evidence was put in the record in both these cases, so not could you make some up now, but does it exist in this record? Understood. There's no extrinsic evidence that exists in the record from the standpoint of the Texas litigation, because there was a motion to strike that was allowed... Did you proffer any parole evidence? We did not proffer, because we feel that... In either case? No, because we feel that all the language is unambiguous, and it does not require extrinsic evidence for the court to determine the meaning of the term. So you didn't discuss it, and you didn't offer anything about it? Correct, in terms of negotiations, that's correct. Okay, thank you. Dealing with the issues that the court raised on the covenant not to sue... If it's true that the covenant not to sue covers every LME product period, then why do we have Section 4 and Section 7 at all? We don't take the position that it covers every LME product period. It covers any LME or Sony product that, but for the PCRA, would infringe one of the wildland patents, a scope that's not defined in the agreement. That works complementary with author limitation of damages... Well, but if it covers any product that would infringe any patent... No, just the four patents that were asserted at that time. There were four patents that were asserted that caused the dispute to begin with. The covenant not to sue provision provides that they cannot bring a lawsuit on any products but that, but for the PCRA would infringe any of those four patents. It's... I don't know how you can make... Are you conceding that Section 3 is limited to those four patents? No, I'm saying it's a product-based protection, and that the scope of that product-based protection is the four PCRA patents. But that leads me into a question I have, which is the Texas court affirmed, or the text that we could affirm the Texas court on either a construction basis or a specific case-related basis here, which is this breach of contract counterclaim. You have the burden of establishing what falls under the covenant, and you didn't argue, and you refused to even stipulate that the accused products would have infringed the four patents. But we did not... We argued it. We did not stipulate to it. You had the burden of coming forward. Yes. One of the conditions, one of the prerequisites to your success in the case would have to be establishing, on your breach of contract claim, that that relevant product that you wanted to now claim that you fell in the covenant not to sue would have infringed one of the four original VLAN patents, and you refused to do it. We offered three forms of evidence, all in the form of party admissions. There were statements made by them directly to Erickson and Sony that said that HSPA-compliant products infringed the PCRA patents. They made that same stipulation in the litigation in Texas, and they made the same allegation in litigation that they had against Apple. That is our affirmative evidence by way of party admissions. A summary judgment... But you're not admitting that your products infringed their patents, which is another reason why the interpretation is a lie, to say that you have to prove that you infringed their patents in order to win your breach of contract action. Respectfully, I don't think we need to do either. This is a summary... We're here on a summary judgment. We need to put forth affirmative evidence. Clearly our burden. I completely agree. Our affirmative evidence is in the form of party admissions. Now, that's material evidence. Now, they have to rebut it. Do those party admissions say, we admit that our products infringed those patents? What those admissions say, unequivocally... That could be a yes or no. Well, I'm sorry. Respectfully, I... So your answer is no, but they say something else. The answer is yes. They do admit it, and the way that they admit it is because they unequivocally state that any product that is compliant with HSPA infringes those patents. And then there is a second admission that they make, that the Texas products that were accused in that litigation are HSPA compliant. That's why I was having trouble just saying yes. It's actually a two-part admission. So that's the affirmative evidence. Now, if they had come up with... Well, you ran away from that evidence. You refused to agree and make an allegation that that was correct. You didn't... You had the burden of coming forward, and you refused to allege, as part of your burden, that those products did fall within those four patents. Well, the reason that we didn't do it then, although we have talked... we have acknowledged that in our briefs and prepared to do that for purposes of this appeal... Yeah, but I'm reviewing his decision. I'm not making it all up as I go along. The reason we did not do it then is because it's not necessary. On a summary judgment basis... Then why is it necessary here? Well, the Texas court raised it as a concern to the extent that this court has it as a similar concern. We're prepared to stipulate, for purposes of the appeal, that the Texas products infringe at least one of the PCRA patents, but we don't believe that Texas... Even though the jury found that they didn't? That was different patents. That wasn't the PCRA patents. Let me... They're the same products. Well, those are the same products, but the jury answered a different question. Okay, but keeping... I'm sorry. No, keeping on the breach and contract question, as I understand it, in order to be a breach, it has to be an obvious or bad faith breach, right? In order for you to get anything out of the breach, the way the contract's written. In terms of what damages we may get? Yes. Honestly, I would have to go back and look at the agreement specifically for that purpose, because that's not an issue on appeal. We do... We would ask that the judgment be reversed, and then we go back to argue damages, but there's nothing in the record as to what damages may be available to the parties. But assuming that I'm right, that in order to get any damages, it has to be an obvious or bad faith breach, given the debate over the analysis and the fact that at least the trial court felt that Section 3 read exactly as Winant says it did, then how could you even have any right to damages? I would make the analogy to giving exceptional finding or a willfulness finding where the summary judgment is denied. Just because there are rulings along the way, that's not dispositive of determining, at the end of the day, whether a higher standard has been met. And in this case, I would respectfully say that the language could not be clearer with regard to the Covenant No. 2. I don't know how you would say it clearly. Because you don't look at it in a vacuum. You better read it in light of the entire document. There is nothing clear at all about this document. So please don't say it again. Respectfully, I think what I would say in response to that is that you have three provisions that protect... I assume you did not write this. Is this correct? That is correct. I just wanted to make sure you didn't have a dog in the fight. Nearly here to defend it. There are three provisions that protect Erickson and Sony. There's the Covenant Not to Sue, there's the Limitation of Damages, and there's the MFL provision. All of those are product-based protections. That's what this fight is about. Is it a product-based protection or is it a patent-based protection? The Covenant Not to Sue protects against suits on any products that infringe the PCRA patents. The Limitation of Damages provision provides a limitation on damages to post-suit filings for any lawsuit against products. In that case, UMTS, HSPA products. The MFL provision is the same thing. It provides a license for, in that case, all products, including but not limited to, UMTS, HSPA products. So in that respect, there is a consistency. Now, to the extent that they point to things that they view as inconsistent, they're relying on supplier rights. Let me throw in an overall. This bothers me a lot. And I want to sort of encapsulate it. At the end of their opening brief, they say, Erickson offers no plausible reason why the parties would agree to an arrangement in which YLAN's assertion of UMTS, HSPA-related patents, quote, would result in a license under YLAN's wholly unrelated digital, TV, and display patents. Give me a plausible explanation. I can give two on both sides of the table, as it were. From their standpoint, we have to remember that YLAN was a fledgling MP at the time that had a strong, demonstrable need to resolve this McCool-Smith lawsuit because they had just filed a new litigation. It was an extremely important piece of consideration for them. So that's their side. So they sold their birthright for a mess of lawyers. They didn't sell their birthright. When they signed this agreement, they didn't sell their birthright at all. They sold certain rights, all of which they had the control to trigger. The reason that they don't like this agreement. But even under their interpretation agreement, Erickson gets a ton of rights here. Erickson negotiated hard for its rights. The reality is they approached Erickson for that disagreement. Erickson was happy to just have McCool-Smith disqualified and have their dispute. They've got the trial in the Texas litigation. We're fighting a Florida litigation. They're not scared of a fight. YLAN came to them and McCool came to them because they wanted to get the deal done so that McCool could continue to be their counsel. This was a very big deal for them. But to the other point, which is equally as important, to the extent that we have this license opportunity, it happened because of two things. They decided to file the lawsuit in Texas against UMTS HSPA. We certainly didn't ask them to do it. They decided two years after the agreement was signed to sign the Bel Air license agreement. It may be that this NFL right was useless to Erickson. It may be that there would have never been a deal that was worthy of them signing. The reality is they decided to enter into that agreement. I don't understand. Tell me again your argument for why, if I interpret Section 3 the way you are proposing, how there's anything left for Section 4. What is your argument again on this? Well, Section 4, at a minimum, covers every other series other than Series 25, which Your Honor observed. But the language of Section 4 expressly says it would also cover HSPA products, which is Series 25. So it's hard to run away from that because it's really specific. So the definition of UMTS HSPA products is the entire UMTS series, right? HSPA is one subset of that. As you observed initially, when you look at the language itself, whether or not the piece of area patents at the time the agreement was signed, what the scope would be was not defined in the agreement. So that's the first problem we have. But even if we get past that observation, there is nothing wrong in the law from a contract... You should look at the first... What's not defined? You're going too fast for me. Sorry. So the scope in Section 3 is products that infringe the PCRA patents, right? That scope is not defined. At the time of the agreement, it was not defined. So we don't agree that everybody agreed necessarily at that time that the scope of the PCRA patents or the YMCA patents was defined as HSPA. But even if we accept that as true for purposes of this discussion, there is nothing wrong from a contract interpretation standpoint for clauses to overlap to some degree. If it created a nullity, so if the entire definition of UMTS HSPA was covered by Article 3, I would agree. Our argument would make no sense because you can't have a nullity from the contract interpretation standpoint. But you absolutely can have overlap in terms of there's nothing in the law that requires that the full breadth of UMTS HSPA be covered by Article 4, as long as there's meaning. There just has to be meaning. The first sentence of Section 4, as Mr. Powers pointed out, says with respect to patents other than WLAN patents to which Article 3 of this agreement applies. It seems as though Article 4 was meaning to apply to other patents and that Article 3 was a meaning to apply to those four patents. That introduction to Article 4 is entirely consistent with our interpretation of Article 3, because the concept is this. You know you can't sue on the four PCRA patents. That's clear, because they will always infringe whatever products by definition. Any other patent is fair game. You can have a lawsuit on a patent and it's perfectly appropriate to bring it in one instance, but it's not in another because the focus is on the products. The protection is all on the products. So they could sue on hypothetical 111 patents and if it's not a product covered by the covenant not to sue, fair game. If it is covered by the covenant not to sue, they can't bring it. Well, but the problem is this very specific language, UMTS HSPA product language, covers Series 25 and... Right. If it just covered, if the definition was just Series 25, I would agree our construction would not work because that would be creating a nullity in Section 4. But the standard is whether or not for two sections could be read in Harmony 2 had meaning. And Section 4 under our construction clearly has meaning because there are 14 other series... Would have meaning only if I cut a portion of what is expressly covered by Section 4 out of Section 4. You want me to cut a donut hole into Section 4 in order to give it meaning. I don't believe you need to, Your Honor. You know when they say when you interpret statutes the specific governs over the general. Section 3, the way you would have me interpret it, is very generalized. And Section 4 is very specific. UMTS plus HSPA products, which is clearly defined. But I don't think the specific over the general covers here. I think the standard is whether both provisions, when you look at their planning, so first we have, if there was ambiguity in the language, that would be a different situation. But we have a very, we have very clear terms. Then the question comes, when we look at... Are you mad? No, that language. Sorry. I'm referring to that very specific language. That products but for the PCRA would infringe the PCRA patents. I agree. Otherwise we could be debating a lot about this agreement. But that language is clear. So then we need to determine whether in the face of that there is some manifest intent of something different. And if that would lead to a novelty in another provision, that's a problem. But if it just leads to an overlap, the law is clear that you can have an overlap as long as both sections... If we were to find this provision, are Section 3 ambiguous, and send it back to the Texas court for further development, or for, obviously the Texas court would be permitted to say, I'll look at the extrinsic evidence already proffered and not allow the record to be reopened since you had every opportunity to submit. If we were to do that, would you continue to litigate this provision? This is an important provision for us to litigate and get an adjudication. First of all, it wouldn't happen in Florida anyway. We didn't move on some adjustment in Florida, but it is one of the defenses in Florida. So in Florida, if it got sent down on this point, we would need to address it there. But yes, we would need to resolve this issue because it's an important issue... So if the court were allowed to look at extrinsic evidence, the only thing it would have before it, unless it chose to completely reopen a record that he already allowed you all to create, would be the affidavit that was submitted by your client. Well, I think if there was a denial of summary judgment because there was ambiguity, then the record is blown open and anything is fair game at that point. Well, that's up to the trial court. If the government has already completed... That would be up to the trial court. The issue would get fully litigated in Florida where there was no summary judgment record on that. So one way or the other, it would get fully litigated if that's what it came down to. If I may, on the most fair of the licensee provision, there are a couple of things that I'd like to address with the little time that I have left because there doesn't... You know, the operative language there is in the event that Erickson... You said that the issue would get fully litigated in Florida. I mean, what if we vacated the Florida judgment? Would this issue then still get fully litigated in Florida? I'm sorry, if we vacate the Florida judgment, is the issue still going to get litigated in Florida under those circumstances? Well, we're the only one to file the motion in Florida. So if the decision is vacated and therefore the summary judgment is reversed, then we would go back to square one. The covenant not to sue is an issue in Florida? It is. It's not... We didn't file a motion for summary judgment on it because the issues were sufficiently different that we wanted to get through discovery first on that. And this was a very early motion, but it is a defense in that case. Did you stipulate to infringe that? In Florida? Of the Wineland patent? No, but there would have been no opportunity that you can do that in that case had we considered it. Because we were just going to mention discovery at the time that the summary judgment was allowed. So summary... So you're saying discovery was ongoing and so if that case went back, discovery would continue? Correct. On the other hand, if we affirm the Texas summary judgment, will the... Florida case? It depends... Well, so on the covenant not to sue? It would potentially impact it, obviously, depending on the court's ruling on that. So with regard to the MSL provision, I just want to... With the little time I have left, I just want to be clear that we believe very strongly that you have clear language in the context of the grammatical rule. So when you have a condition, if it reigns, and you say reigns in the present tense, that means you're talking about the future. Everybody understands that the conditional phrase talks about the future. The question is whether there's something different. Well, why does it necessarily talk about the future? I mean, in the event could mean if there are patents that are out there that we're not necessarily focusing on or aware of. Why couldn't that be it? Why does it have to be in the future as it relates to the existence of the patent? Well, I would characterize it more as a presumption. So you have... When you apply the grammatical... So what's your case law that says that the words in the event presumptively relate to future acquired rights? Especially given the definitions that we find in whites, for example. The case law would be that rules, the grammatical rules, apply to language. And if the language is clear after applying the grammatical rule, then that's what you control unless there's a clear intent to the contrary. That's when Mary Remmer talks about that proposition. I guess maybe we just have a different version of what the grammatical rule necessarily is. Well, that's not disputed in the record. In the record, we cite to... We cite to a University of North Carolina site. But we cite the grammatical rule. They don't cite anything to say that that grammatical rule is wrong. When I was a young lawyer, I was assigned to clean up a contract. And so I did exactly what you said. I applied the rules of grammar to it. And the partner to whom I handed it said, well, you eliminated this language. Why did you do that? And I said, to make it clearer. And he said, yeah, but that language has been interpreted by a court before and it has meaning. And if you change it, somebody's going to say, well, you must have wanted to change the meaning. So if that language has been interpreted by a court before, as I said, it's been defined in numerous legal dictionaries, then what you're arguing for is a grammatical change which changes the law. I think if we were in a situation where there was language and that language was changed in the scenario that you've given, that was the evidence of the parties Well, you're changing it through grammar. It's the same thing. I don't think it's... There was nothing that was changed. It was an expression of an understanding that was done grammatically correctly to convey a concept. Then when we look at the rest of the agreement, the agreement, in our view, is actually quite consistent with that. That if we look at all the... The agreement, Article 4, specifically says, honor after the effective date of this patent. I mean, the parties knew how to capture future rights, and they didn't do that here. They did it when they were non-conditional sentences. When they were declaratory sentences where if you just used the present tense, it would certainly just convey the present. But in the three instances, there were three instances where in the event that was used in the agreement, and in two of them, they don't dispute that it conveys the future. It's only this one that they say doesn't convey the future. So it still could be the acquisition of future knowledge regarding existing rights. It could be... Well, yes, it could be a lot of future things. But the point is, it does convey the future and one aspect of that. If you look at the rest of the MSL provision, it is all geared toward the future. It talks... One of the other conditions is that there would be an allegation of infringement or infringement, something certainly not occurring that day because if it was, it would have been the PCRA patent themselves that would have triggered the MSL provision that moment. So you have a situation where the other condition is clearly thinking about the future and it would be incongruous to think that one condition is contemplating the future but the other is not. When you look at that Section 4, the Limitation of Damages provision, which they cite to as evidence of being both present and future ownership, it's clear that the Limitation of Damages and Section 7 interact with each other. They have overlapping triggering events wherever a lawsuit is filed on a UMTS HSPA product. It would be incongruous, again, that you're going to have a triggering event for the Limitation of Damages that clearly is future but you're not going to have that same triggering event for... I don't understand this argument at all. You're going to have to go slower and dummy it down for me because I'm not getting it. What are you saying? On the last... Whatever you just said about the triggering event. So Article 4, the Limitation of Damages, is triggered for any lawsuit on any UMTS product that's not otherwise exempted by a covenant not to sue. Article 7 is triggered by any allegation of infringement of the UMTS product. Within that, obviously, is an actual lawsuit. So Article 4 is... which limits damages relating to patents other than the WLAN patents is triggered by a lawsuit. Right. Is that what you're saying? It's triggered by a lawsuit and that lawsuit can be brought on any patents then owned as of the effective date or thereafter. But that's what Section... Section 4 says that for infringement of any patents that on or after the effective date are owned or controlled by WLAN. Right. But Section 7 doesn't have any reference to on or after the effective date. Right, because... You want us to imply it into that. I don't... You don't need to imply it because grammatical rules say that when you put a present tense verb in a conditional sentence it contemplates the future. If that were true then all the hereafters you have in here would be superfluous and we don't read language out of contrast. It would not be superfluous because they're all declaratory sentences. Whenever we have the three in the event that references they all... two of them don't have that language at all and they agree that those refer to the future. So we have three in the event that sentences. They agree that two of them refer to the future and dispute this last one. We have two declaratory sentences that are not conditional and they put the additional language in. That's entirely consistent with how you do a grammar. I'm a grammarian and I'm not buying this. So try something else. Move on. Well, we would say that... Actually, close it up. We're way over. We're over more than he was over. So you'll get another chance. I said one, two, three, four. So... Then I will reserve for the remaining time after Mr. Powers speaks. Okay. So, Mr. Powers, we're going to give you four minutes and we're going to give him the same four minutes afterwards. And you guys exceeded your 30 that you were originally promised and I didn't achieve much in any of this. What you did achieve was not having two distinct arguments on highly related subject matters. So at least we've achieved that. I'd like to begin, if I may, with the MFL and I want to address the comparability issue that we weren't able to get to in the first discussion. Before you do, is it true that the Florida litigation, you know, basically we can't avoid looking at this covenant not to sue language? And if I thought it was unclear and were willing to do what you suggested, which is look at the parole evidence because discovery closed there. They had an opportunity. They didn't submit it. And I said, Mr. Powers is correct. The parole evidence can afford only one answer. And then I say, this is the answer. Doesn't that end up being the answer only for this darn Texas case? And in Florida, they go back down and they introduce new parole evidence and so they're not bound by that discussion. I think that's in part up to the judge in Florida. And I think in part that will result from the rules of race-gender equality. Either one of those could produce different results. Is the Florida case, I thought the Florida case was closed. They closed the case, right? They closed the case based on the summary judgment resolving all the disputes then there if you vacate. Okay, so the covenant not to supervision is only relevant in the Florida case if we reopen it. True. Okay. There is a second Florida case that they have started again. And I don't think the covenant has been issued in that one yet. That appears just to be the NFL case. And that second Florida case relates to what? It relates to an attempt by Erickson to assert rights to defend its customers with whom Weiland is having discussions. Do you guys do this in conjunction with civil procedure professors? Just to create case studies for all students. Not deliberately. The comparability analysis I'd like to touch on briefly because I think it's an important aspect of the NFL clause. The Florida court disregarded it entirely and plainly under any analysis anywhere, anytime. Adopted a license agreement that could not be comparable or deemed under any definition of NFL and NFL comparable type of agreement. It was a puny company with minuscule sales in the United States and portfolio-wide license that has nothing to do with Erickson's business. It's a Wi-Fi business versus Erickson's business. It's not comparable in any of the respects in which you could think of. But most favorite licensee under Section 7 is not defined, is it? It's defined in the... It's not defined in Section 1 explicitly. It has a meaning that's well understood. It is defined in Sections 3 and 4 explicitly. Actually, 2 and 3. In 2, it says similarly situated licensees include but are not limited to licensees... Where are you reading from? Article 7, Section 2. It's Page 7 of the agreement. It's Page 6, if they're to be attended. But... So the question is whether or not similarly situated licensees as it relates to Section 2 and it relates to a future agreement is considered the same thing as a most favorite licensee under Section 1. Exactly. And Section 3 as well because Section 3 makes explicit that you don't consider apples and bananas because it has to have a volume of sales and those sorts of factors. Those factors are typically what are taken into account in an MFL analysis. My point is that it's sort of the issue that Your Honor raises, Judge O'Malley, I think is an issue that Erickson raises but I think it's in a sense a meaningless question. The term most favorite licensees has a meaning. It doesn't mean any old agreement that you apply there. It doesn't mean they get the benefit of any agreement. But it doesn't have a defined meaning in this contract. You're saying it has a defined meaning in the law generally? I'm saying Section 1 does not contain a definition of it but Sections 2 and 3 do. Those should be applied to Section 1 because that's the definition the parties gave to it. They weren't It would be bizarre to say that you get any old agreement at all as your first agreement but then you have to go through these very rigorous requirements for subsequent agreements. But Section 2 begins 7-2 begins with the section the statement if a future agreement is entered into by the parties. I don't understand I don't understand your argument because as I understand this section under 1 you get the best rates out there regardless of what what the people might be the same or different at. And Section 2 gets more specific because now we're going to change the rates that you got. You already got rates and they were the best rates at the time but it turns out now you've been undercut and we've given rates to somebody else. So now if we're going to undo the rates we gave you before and do a do-over we're only going to do that do-over which makes sense if it turns out you are really comparable to those other people. And so I mean that seems to me to be a reasonable way to interpret this contract and it seems logically to make sense to even do it that way. I understand. So what what is your contextual basis for otherwise? That the language most favored licensee status has a meaning. We submitted an expert a declaration from Mr. Jaros that doesn't describe that meaning in detail. That meaning is exactly the same as what's contained in paragraphs 2 and 3 so the party statement of what MFL means is consistent with the general usage of that term. It doesn't mean any license agreement so your honor's example is a rate. That's not what they're doing. If there were a rate out there that's one thing. Here they're taking a puny Canadian company that got portfolio wide rights for virtually nothing and they're saying we want portfolio wide rights for virtually nothing because we're Ericsson and we want that same deal. Well that same deal might be as if you did an imputed rate which you often would do in a most favored nation's licensee's analysis. That might produce $200 million liability for Ericsson if you imputed the rate. They're not asking for that rate. They're asking for the lump sum of a very small Canadian company which is not comparable in any respect. And I think so the way to think about this is there's two limits on the NFL. One is it has to be a comparable entity and a comparable deal. Otherwise it's not a most favored licensee status. That's not what it is because that would make sections two and three then pointless. And... Now do we have to say that the term most favored licensee status is ambiguous in order for us to consider your expert declarations relating to it? I don't think you have to consider it ambiguous. You have to consider it undefined if you don't accept that the definitions in two and three apply to it. And the definition is one... It doesn't mean just any agreement out there. It means most favored licensee which is a term of art. It is a term of art used in licensing discussions. And when you use a term of art you're stuck with what that term of art means. It doesn't mean you get any old deal out there. I'm sorry. I think I cut you off. You said there were two limits and then one are that they're comparable and the other that it's a comparable deal. Is that right? Well, and the other is that you're limited to the patents that existed at the time. That's the issue that we debated earlier where it could be different patents but it's patents that existed at the time of the PCRA. And that's the whole in the event. And I just want to respond very briefly on the in the event issue. Yes, that implies something in the future. It doesn't imply future acquired patents. We've got about 20 seconds. The future issue is the discovery that there were patents that existed at the time that could have been asserted and would have been included in these four but weren't. And that's what the Perelman Declaration makes clear. The only other issue I wanted to do in my remaining 10 seconds. No, you don't have any seconds. We're done. You're four minutes over. Come on. Thank you. And Liz, did you have something you needed to know? Okay, because you have something else and I'll go. And I still haven't brushed it up on my Section 28 U.S.C. 2202 for that procedural motion. Dealing with the scope of the rights that are granted by the MFL provision. The language, Section 1 provides for one agreement at most favored licensee status. In this court's 1997 decision in SGK, I'm not going to try to pronounce that first name, v. Hercules, when you have that kind of right, the licensee gets to choose. It doesn't need to be defined. It's a subjective determination that the licensee gets. So you get that first agreement. And then there is a second right at the apple. And when you look at the two provisions, or the three provisions, Sections 1, 2, and 3, and you look at the various aspects of the language, it's clear that that is what is contemplated. And I'll point to a couple examples. In Section 2, Section 1 talks about status, which is going to combine, it's going to be much more than race. It's going to be dollars and years and all that. Sections 2 and 3 talk about race, something different. Now what those rates are for are not for all products. Section 1 talks about a license for all products. Sections 2 and 3, and Section 2 in particular, talks about more favorable rates for UNTS HSPA products. So it's defining a different right that can come later. Section 1 talks about the most favored licensee. That's what you're comparing it to. Section 2 talks about more favorable. So it's something that's coming later. They do use the phrase most favored licensee status. And you say that that means that we'll grant your license at the best rate we've ever given to anyone else. Why do you say that? That's terms. Well, because I agree with Mr. Carlos that that is an understood meaning not just within this industry but within a lot of industries. That it is the best terms. So it could be that it's a cheap rate, but it could be a narrow scope or it could be a short term. Subjectively, Erickson and Sony may not feel that that's a good enough deal for them to warrant invoking their rights. So it's a combination of things and they get to choose. And that's what the Hercules case talked about. So also... But you agree to the extent that it's an understood term in industry that it has to look at the comparability of the entities and the deal? No. And they say there's no cases that stand for that proposition. The Hercules case says quite the opposite, which is... Well, the Hercules case says that you get to choose whether you want the deal or whether you don't want the deal. It doesn't say really how to define the deal. Right. Because you don't need to. That's the point. The licensee gets to decide. Okay. But the licensee gets to decide what the deal is? No, no. It's the universal thing of deals that have been struck. Right? So deals have been struck after the request is made or deals have been struck before the request is made. Those are all offered up, as it were. Here they are. And the licensee gets to decide if one of those is sufficiently acceptable. That's what Hercules stands for. What about similarly situated? Similarly situated gets invoked for a deal after that first agreement. So there's a second bite at the apple. But it's only for UOTS, HSPA profits. And if you look at the arbitration provision, for instance, Article Section 6, which is an arbitration over similarly situated, it only refers to Section 2. If the similarly situated requirements were to apply to Section 1, the arbitration provision should apply to Section 1. If what they say is true, here's to me the biggest problem with it. If you accept their argument as true, which is Section 1 is merely a right to a license, all terms of which need to be negotiated, and all you get is an MSL provision, which then later is invoked by Sections 2 and 3, you can read out Section 1 entirely from the agreement. I would invite the court to do it. You can read it out entirely under their construction. No, because Sections 2 and 3 talk about future agreements between the parties as opposed to you get this regardless of whether we enter into a future agreement. Right, but the only thing that we would get by their construction is some commercial terms that we agree to plus an MSL provision. According to them, that's the only thing that Section 1 provides. And you get that whether or not there's an additional agreement. So it's not reading it out of the agreement. It's just making it less favorable to you. Well, their construction is that what that means is informed by Sections 2 and 3. Let me ask you a question I asked Mr. Powers before. If really your argument seems to be that there appears to be no real meeting of the minds with respect to many of these provisions, why didn't you say to the Texas court, Judge, if you don't agree with us, then we seek reformation to make it clear what the provisions really mean? I was not counsel in the Texas litigation either like Mr. Powers. I would surmise that the answer was now that this party is disagreeing, it doesn't mean that the other party believes that there's no meeting of the minds. We believe that the agreement is clear. I would acknowledge that the plan construction terms are not ambiguous just because people disagree. I think from Erickson and Sonny's standpoint, the language was clear, there was a meeting of the minds, so there's no need to reform anything. You're going to sit down and use the word clear two more times? I will not say it again. I apologize. I gave up. Okay, you have a closing thought to wrap this up? Yes, Your Honor. I'm not going to use the word clear. I'll say plain language. We do think at the end of the day while the agreement itself has imperfections, the provisions themselves have plain language. And to the extent that there is not a clear manifestation of a different intent other than within that plain language, that plain language should be controlled. And for the reasons we've talked about, we don't believe that there's been sufficient proffering of a different intent. I think the counsel of the cases are taking under submission.